UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )      No. 3:08-CR-7
                               )
V.                             )      (Varlan / Shirley)
                               )
MARCUS D. JARNIGAN,            )
                               )
                Defendant.     )


## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the district court as

may be appropriate.   This matter is before the Court upon Defendant Marcus D. Jarnigan's

("Defendant Jarnigan") Motion to Suppress Evidence [Doc. 15] and Memorandum in Support [Doc.

16], filed March 24, 2008.   The parties appeared before the Court on May 15, 2008 for an

evidentiary hearing.   The government was represented by Assistant United States Attorney David

Lewen ("AUSA Lewen").   Attorney Michael McGovern ("Attorney McGovern") appeared on behalf

Defendant Jarnigan, who was also present.   At the conclusion of the hearing, neither party requested

leave to file post-hearing briefs.   Accordingly, the Court took this matter under advisement on May

16, 2008 and is now ripe for adjudication.


I.      **Procedural Posture**

On April 16, 2008, this Court held an evidentiary hearing on Defendant Jarnigan's Motion

to Suppress Evidence. At the hearing, the Court heard testimony from Officer James Lockmiller with the Knoxville Police Department ("KPD") and Ronnie Davis. On April 16, 2008, the government filed, by way of motion, a request to re-open the suppression hearing [Doc. 23] for the "limited purpose of allowing two additional KPD officers to testify on the issue of the 911 complainant identifying the vandalism suspect" [Doc. 23 at 1]. On April 24, 2008, this Court entered an Order granting the government's motion to re-open the evidentiary hearing [See Doc. 30] and accordingly, held a continued evidentiary hearing on May 15, 2008. At the May 15, 2008 hearing, Officer John Stevens and Officer Caleb Crothers, both with the KPD, testified.

II.     **Suppression Hearing Testimony**

   A.     *Officer James Lockmiller*

      As its first witness, the government called Officer James Lockmiller ("Officer Lockmiller") with the KPD. Officer Lockmiller testified he has worked for the KPD for almost four years as a patrolman; his responsibilities include working patrol and answering calls for service. He further testified he worked the evening of December 31, 2007. He stated his duties on that particular day were similar to his usual duties, which included answering calls for service and working on routine patrols. Officer Lockmiller stated he responded to a 911 call on December 31, 2007. Officer Lockmiller was notified of the 911 call in two fashions: first, he was notified over radio by dispatch with regard to the address of the call, the nature of the call, and pertinent details; then, the exact same information received by radio is sent to a mobile data terminal, which is a laptop computer in his police cruiser. Officer Lockmiller stated this allows the officers to review the information as needed.

In regard to the 911 call on December 31, 2007, Officer Lockmiller stated the call had several layers of information. The call informed the police that there was a suspected black male who was armed with a gun; that there were people intoxicated at the location; and that there was vandalism to a residence. He further testified that he had a chance to listen to a recording of the 911 call and that it fairly and accurately represented the information that was transmitted to him via his radio and his mobile data terminal. The recording of the 911 call was then played for the Court [Ex. 1]. The 911 call contained the following information, which the Court transcribed for purposes of this Report and Recommendation:

- 911: "Knox County 911"

- Female caller: "I need you now at 1801 Lombard. I've got somebody out here with a gun; they're trying to break in the door."

- 911: "Male or female?

- Female caller: "It's a male. This guy jumped my husband a minute ago. They pulled out a gun."

- 911: "Is he white, black, Hispanic?"

- Female caller: "Black"

- 911: "What's he wearing?"

- Female caller: "I don't know, I'm not at the window. I'm staying away from the window"

- 911: "How do you know him?"

- Female caller: "I'm trying to stay away from the window, sir."

- 911: "I understand. How do you know this individual?"

- Female caller: "They live across the street. We went over to say 'Happy New Year' to a

friend of ours and to see if she liked our Christmas present we gave her. These dudes were drunk because they've been drinking."

- 911: "So, it's a neighbor? I've already got a call sent out and officers are going to get there as fast as they can, but I need some information for them. This person with the gun, you say he's a black male; how old does he look? "

- Female caller: "There were four or five of them earlier. [Inaudible]. The one, his name is Bulldog."

- 911: "The one with the gun, how old does he look?"

- Female caller: "He looks about nineteen years old."

- 911: "You don't know what he is wearing?"

- Female caller: [yelling to someone in the house].

- 911: "How old is he?"

- Female caller: "I'm trying to keep people from going outside."

- 911: "Is he the only one with a gun?"

- Female caller: "There was one person with a gun and I don't know if anymore of them had a gun. We went over to say 'Happy New Year' to Nicki and they jumped, [Inaudible] this one dude got out of a car."

- 911: "Does anyone need an ambulance right now?"

- Female caller: "No, nobody needs an ambulance right now. My husband [inaudible]."

- 911: "What is your name, ma'am?"

- Female caller: "Jamie Matthews."

- 911: "What's the phone number you're calling from?"

- Female caller: "I'm calling from my cell phone [phone number excluded by Court]."

- 911: "Is this a house or an apartment?"

- Female caller: "It's a house, 1801 Lombard Place."

- 911: "Be watching for the officers."

- Female caller: "They were trying to get into the house."

- 911: "Are they still outside right now?"

- Female caller: "I'm not getting ready to look out the window."

- 911: "Does it sound like they are still out there?  Can you hear them?"

- Female caller: "I'm not looking out no window."

- Male in background: "Do we got to go through all this to get the police over here?"

- 911: "Sir, the officers will get there as soon as they can."

- Male in background: "I can't get no help, I don't live in West Knoxville."

- 911: "Sir, they will get there as fast as they can, they're not going to be right around the corner."

- 911: "Sir, these are questions the officers ask as they are on the way, they are going to need to know before they get there."

- 911: "Just be watching for the officers."

Officer Lockmiller was then asked the address given in the 911 call.  Officer Lockmiller stated, in response, that the address given in the 911 call was 1801 Lombard Place.  He testified that since the day of the incident in question was New Year's Eve, he had additional concerns given the increase in excessive drinking and reckless endangerment with firearms.  He also stated that the KPD routinely runs into an increase in calls regarding reports of excessive gun use and shots fired

on New Year's Eve and that these calls sometimes go unanswered due to the sheer volume.

Officer Lockmiller stated he was familiar with the area in which 1801 Lombard Place is located; he stated it is directly adjacent to Green Hills Apartments ("Green Hills"). Green Hills is a privately owned apartment complex, which accepts vouchers from Knoxville's Community Development Corporation ("KCDC") and Section 8. Officer Lockmiller testified he and other KPD officers respond to calls within the immediate area of Lombard Place at least every week, if not multiple times during the week. He also stated that he hears calls concerning that area nearly every day. The types of calls received from this area include reports of shots fired, vandalism, assaults, general disturbances, and domestic violence.

AUSA Lewen then asked the witness to describe where Lombard Place is in relation to Green Hills. Officer Lockmiller stated that Lombard Place is less than a block east of Green Hills. He stated Natchez Avenue is the cross street, which runs to the entrance of Green Hills as well as to Lombard Place. Officer Lockmiller further testified that in addition to responding to 911 calls, he has a patrol area which he is more responsible for than other areas; his patrol area of response is in east Knoxville, from Henley Street to Midway Road.

AUSA Lewen then asked Officer Lockmiller if Lombard Place was a high crime area at the time he responded to the 911 complaint on December 31, 2007. Officer Lockmiller responded in the affirmative and further stated that the KPD has units dedicated to that area almost on a daily basis.

Officer Lockmiller then testified in more detail to the events in question on the night of December 31, 2007. He stated he was not the only officer to respond to the 911 vandalism call, but that Officer Crothers and Officer Stevens were already on the scene and speaking to the vandalism

victims when he pulled up and exited his cruiser. He stated he approached the two other officers and asked them for further details in connection to what the victims had already told them. He also stated that he observed the victims and they looked very upset, but were coherent, lucid, did not appear to be intoxicated or under the influence of some substance, and were very adamant about what had happened earlier. Officer Lockmiller did not see any evidence of vandalism because he did not make it to the house in time, but the other officers told him that a window had been broken. Officer Lockmiller then stated that at this time, one of the vandalism victims directed the police to someone across the street.

AUSA Lewen continued his questioning by asking Officer Lockmiller how many victims were at 1801 Lombard. Officer Lockmiller, in response, stated that there were two people talking to the police, a black male and a black female. He further testified that the male identified an individual across the street and stated that was the person who broke his window. The male further told the police that the person who broke the window was wearing a white jacket with a red hoodie underneath. Officer Lockmiller continued and stated that, to his knowledge, the male who identified the person across the street was the owner of 1801 Lombard and he believed the victim told the police his name was Ronnie Davis. AUSA Lewen then asked Officer Lockmiller if the information given to him by Ronnie Davis as well as the information he received from the other officers once arriving at the scene corroborated information he received from the 911 call operators. Officer Lockmiller answered in the affirmative.

Officer Lockmiller further testified when Mr. Davis pointed across the street, he turned around and saw a black male exiting from the residence identified; the person across the street was wearing a white jacket with a red hoodie underneath, which matched the description given by Mr.

Davis.  The street separating the two houses was Lombard Place, a public road.  Officer Lockmiller then stated that the person across the street had an object in his hands, which appeared to look like a beer bottle.  At this point in his testimony, Officer Lockmiller identified the Defendant as the person who was identified as the suspect standing across the street wearing a white jacket and a red hoodie.

Officer Lockmiller then stated that when he turned to look at the Defendant across the street, the Defendant began running behind the house and left the property he was standing on.  When the Defendant began running, he was running erratically.  Officer Lockmiller testified he and the other officers felt Defendant's running was unprovoked flight, since there was both reasonable suspicion and probable cause that he committed the vandalism at issue since he was identified by Mr. Davis. At this point, Officer Lockmiller and the other officers gave chase.  Officers Crothers and Stevens took the same path as the Defendant, while Officer Lockmiller proceeded north up Lombard hoping to cut off any route for escape.  The foot chase paralleled Lombard behind several houses.  While chasing the Defendant, Officer Stevens issued commands for him to stop.  According to Officer Lockmiller's testimony, all three officers were wearing police uniforms at the time of the chase.

AUSA Lewen then asked Officer Lockmiller how long the chase lasted; Officer Lockmiller testified it lasted about a minute or less, ending when the Defendant fell.  Officer Lockmiller testified  that it appeared Defendant tripped over his own feet.  He did not fall as a result of police force, such as pushing, tackling, or having an object thrown at him.  After Defendant fell, Officer Lockmiller stated that he noted Defendant had a strong odor of alcohol on his person and that his eyes were bloodshot.  Officer Lockmiller further stated that after Defendant fell, he was take into custody for vandalism, evading on foot, and public intoxication.

Once taken into custody, the officers conducted a pat down search to make sure Defendant did not have any weapons. Second, the officers conducted a search incident to arrest on the vandalism, flight, and public intoxication charge. The search yielded several live rounds of Winchester 9-millimeter ammunition in Defendant's pocket, but the police did not find a gun. Officer Lockmiller stated he found this troublesome since the 911 call reporting the vandalism detailed a black male with a gun and the Defendant had been identified as the vandalism suspect.

Officer Lockmiller then stated that, at this time, the officers were taking the Defendant to their cruiser, which was parked in front of 1801 Lombard. As he approached the house, Officer Lockmiller noticed two things: one, that a larger group of people started to congregate around the house which Defendant exited from prior to the foot chase, and two, the two vandalism victims were standing next to the police cruiser across the street. Officer Lockmiller stated it was clear that the people were forming two separate groups, and the group in front of the house from where Defendant fled was upset at his being taken into custody.

After being taken into custody, Defendant made statements to the police. He told Officer Lockmiller that he had been drinking, and later, when he was in the back of the police cruiser, Defendant advised the officer of an outstanding warrant and a prior felony conviction. Officer Lockmiller also testified that when he began asking Defendant standard booking questions, such as name, address, and date of birth, Defendant initially responded his name was Deon Jones and that he was born in 1974. Officer Lockmiller further testified he was able to ascertain that Defendant was lying because he told Officer Lockmiller he was 32, which is the incorrect age for someone born in 1974. Officer Lockmiller stated he was trying to confirm Defendant's identity since he did not have any identification on him. Officer Lockmiller further stated the KPD has several information

databases to confirm a person's identity upon arrest, but could not confirm Defendant's identity with the information Defendant provided to him.

Officer Lockmiller then testified that, at this time, Mr. Davis told the police he was mistaken and that the person in custody was not the person that vandalized his house. Officer Lockmiller stated he found this sudden reversal odd since prior to the chase, Mr. Davis was quite secure in his identification. Officer Lockmiller stated he believed this sudden change resulted from the large group of people gathered outside of the two houses on Lombard Place. Officer Lockmiller also testified that there was a second 911 call, the information from which was transmitted to his data center in his cruiser while he was trying to confirm Defendant's identity [Ex. 1]. The 911 call contained the following information:

- 911: "Knox County 911"

- Female caller: "Yea, I need you to let [inaudible] at 1801 Lombard. I can't talk outside and tell them what's going on because of all of the drug dealers but the one that has a white jacket on that they did chase around the house, that is the one that did pull the gun out on my husband earlier. But it can't be said out there because all them sell dope and I'm not trying to get hurt."

- 911: "1801 Lombard, the police are there?"

- Female caller: "They are here. They chased the dude around the building. He is the one that had the gun and pulled it on my husband earlier."

- 911: "Yes ma'am."

- Female caller: "I need you to let them know without me having the say anything out here [inaudible] all these dope boys, please."

- 911: "So the one they have is the correct one who pulled the gun out correct?"

- Female caller: "That's the one that pulled the gun. My husband don't want to turn nobody in because they came to the house with guns and tried to get into the house. We have to live here."

- 911: "OK, I'll let them know for you."

- Female caller: "They have the right one. Check around he may have [inaudible] or he may threw it when they chased him"

- 911: "What is your name, ma'am?"

- Female caller: "Jamie Matthews"

- 911: "I'll let them know ma'am."

AUSA Lewen then asked Officer Lockmiller, even if Defendant was not the vandalism suspect, whether the police would have released Defendant that night. Officer Lockmiller replied no since the Defendant advised the police he had outstanding warrants, which required an arrest and booking in conjunction with his unprovoked flight and public intoxication. Officer Lockmiller further testified that Defendant asked him to have his family members call the bondsman. At this time, Officer Lockmiller read Defendant his Miranda rights, which Defendant waived.

Officer Lockmiller further testified a gun was eventually found that night as a result of a canvas through the direct route of the foot pursuit. The gun was found along the foot path as well as a hat and a beer bottle. The gun found was a black semiautomatic handgun loaded with Winchester 9-millimeter bullets, the same type of ammunition found in Defendant's pocket when he was apprehended. Officer Lockmiller then identified Ex. 2 as a photograph of the handgun that was recovered and the location in which it was recovered from.

On cross-examination, Attorney McGovern first asked Officer Lockmiller about the 911 tape the government played for the Court on direct examination [Ex. 1]. In regard to the first call, Attorney McGovern asked whether Officer Lockmiller heard the recording prior to arriving at 1801 Lombard Place. Officer Lockmiller stated he did not and explained that the information heard on the tape is taken by a call processor and sent to the dispatcher, which is sent to the police via a radio dispatch and the mobile data terminal. Officer Lockmiller stated the information received over the radio dispatch was the same as was sent over the data terminal: black male with a gun, intoxicated people; and a broken window. In regard to the second call, Officer Lockmiller testified that the first time he heard that portion of the 911 tape wasn't until after the Defendant was taken into custody, but the information was transferred to him via his mobile data terminal.

Officer Lockmiller was then asked, in regard, to the tape heard in Court, if he heard when the caller was asked what the suspect was wearing, the caller said she did not know. Officer Lockmiller answered in the affirmative. Officer Lockmiller further testified that the caller indicated that the suspect lived across the street, but he could not state if the person who lives across the street from the vandalism victim is the Defendant, nor did he know at that time if Defendant lived across the street from 1801 Lombard Place. Officer Lockmiller also stated he heard the part on the tape when the victim indicated that the suspect was nineteen to twenty years old, but that he did not know how old Defendant Jarnigan is. Officer Lockmiller then testified that he heard the part of the recording in which the victim said she was not looking outside the window because the vandal had a gun.

Officer Lockmiller was then asked about his designation of a "high crime area" and to what area did it apply to; Officer Lockmiller stated the "high crime area" designation includes Green Hills

as well as the streets immediately adjacent to it. He further stated he is familiar with Natchez Avenue and Lombard Place since he has been patrolling that area during his tenure with the KPD. He was then asked about the area of woods between Green Hills and Lombard Place, but he could not say how large the woods are. He stated that Lombard Place is maybe a half of a block from Green Hills. Attorney McGovern and Officer Lockmiller then drew a map of Lombard Place, including designations for 1801 Lombard and Green Hills [Ex. 3].[1] Officer Lockmiller then stated that there are no roads between Green Hills and Lombard Place, but in the past, the police have had foot pursuits which go over the fence from Green Hills in both directions; however, he agreed that Green Hills is segregated from Lombard Place.

Attorney McGovern then asked Officer Lockmiller about the types of calls he responded to on Lombard Place prior to December 31, 2007. Officer Lockmiller stated he would have to go back through his call records to give specific dates on which he responded, but that there were complaints of drug activity on that street in the couple of months prior to December 31, 2007. He further stated he did not make any arrests, but went to the area to complete an investigation in response to a complaint. He further testified in his four years with the KPD, he responded to approximately ten calls on Lombard Place.

Officer Lockmiller further stated that when he arrived on the scene, he was the third officer to respond. Officer Stevens and Officer Crothers were already there. Officer Lockmiller spoke with the other two officers to determine what had occurred and confirmed he did not speak with the vandalism victim prior to the foot pursuit. However, he clarified his previous testimony by explaining that he saw the victim point to the Defendant and he heard the victim verbally indicate

---

[1]Defense counsel does not contend the drawing submitted at Exhibit 3 is drawn to scale.

that the person across the street was the person who vandalized his house and told the police what the Defendant was wearing, a white jacket and a red hoodie.

Officer Lockmiller was then shown some photographs by Attorney McGovern and identified the photograph with a railing in the bottom portion of the picture as looking like Lombard Place [Ex. 4a], but defense counsel later disregarded the photograph because Officer Lockmiller could not identify it with particularity. Officer Lockmiller was then shown a second photograph, in which he identified the house in the photograph as the residence in which he first observed the Defendant [Ex. 4b]. He stated he first identified the Defendant coming out of the front door and marked with a pen the house in which he saw Defendant [Id.]. He further stated when he first saw Defendant, he was walking out the front door and coming down the porch stairs. Officer Lockmiller made eye contact with Defendant after Defendant made his way down the stairs, then Defendant began to run in a northern direction, towards Natchez. Officer Lockmiller stated Defendant never ran out onto Lombard, but instead ran between the house that he came out of and the next adjacent house north.

Officer Lockmiller testified that when Defendant initially came out onto the porch, he was about thirty to forty feet from where Officer Lockmiller was standing. He further stated, at that point, he could not smell Defendant's breath nor see his eyes and that Defendant did not appear to be a danger to himself or anybody else. Officer Lockmiller testified that he could not see the bottle Defendant was carrying, just that it was a dark-colored bottle and had no reason to suspect that Defendant was intoxicated. In regard to whether or not Defendant was carrying any kind of weapon, Officer Lockmiller testified he only knew the vandalism suspect had been identified as a black male with a gun, but, at that time, did not have any knowledge that Defendant had a weapon on him.

Officer Lockmiller further testified that when Defendant first started down the porch stairs,

he was not under arrest nor did any of the officers indicate to him that he was under arrest or that he should stop. Officer Lockmiller then stated that when he made eye contact with the Defendant, the Defendant started to run and as a result, the officers began to pursue him. Officer Lockmiller then testified he and the other officers pursued the Defendant because he was identified by Mr. Davis as the vandalism suspect. He affirmed that the only basis for pursuing Defendant at that time was that the officers suspected Defendant was the perpetrator of the vandalism, based on Mr. Davis's identification.

Attorney McGovern then showed Officer Lockmiller Exhibit 4c, a photograph, which Officer Lockmiller identified as the space between the house Defendant came out of and the house immediately north of that house. Attorney McGovern asked if this was the space between the two houses in which Defendant was pursued. Officer Lockmiller, in his reply, stated he did not pursue the direct chase of Defendant, instead he paralleled north on Lombard. Thus, he conceded he had no knowledge of what transpired during the direct chase. His next contact with the Defendant was about three houses north of the edge of the photograph. He marked the location on Exhibit 3 and drew a dotted line on Exhibit 3, identifying his course of pursuit. When he next saw the Defendant, the Defendant was still running and Officers Crothers and Stevens were behind him. Officer Lockmiller further testified that he saw Defendant trip and fall, which allowed the officers to maintain contact and take the Defendant into custody.

Officer Lockmiller was then asked about his survey of the path of flight and his search for the weapon. He stated he initially made a quick survey of the area, but could not conduct a detailed search in light of time constraints and safety concerns. He conducted a quick survey and then proceeded back to his cruiser, where Defendant was in custody. According to Officer Lockmiller,

Officer Hurst found the gun under the wheel well of a Mercedes Benz [See Ex. 2]. Officer Lockmiller did not know which house the Mercedes was parked behind, but that it was east of the houses which were on the east side of Lombard Place. Officer Lockmiller was shown photographs marked for identification as Exhibits 4c through 4g and asked to identify where the Mercedes was parked on December 31, 2007. Officer Lockmiller, using Exhibit 4b, stated that the Mercedes was parked behind one of the two houses previously indicated, either the one Defendant was in or the one next to it. Attorney McGovern asked if Officer Lockmiller could testify as to the location of the Mercedes in relation to the dark-colored van in Exhibit 4f. Officer Lockmiller stated he could not because he did not remember the van being there on December 31, 2007. Nor did Officer Lockmiller remember if the front of the Mercedes was facing towards Lombard or away from Lombard. The gun was found on the passenger side of the Mercedes, which Officer Lockmiller was able to discern from looking at the photograph, [Ex. 2], based on the taillight.

In regard to the testing procedures done on the gun, Officer Lockmiller stated he did not know if the gun was tested to determine whether it had been recently fired or if a fingerprint test was done. However, he did comment that it is typical procedure to fingerprint the gun, but could not tell the Court who performed the test.

When Defendant fell, which allowed the police to take him into custody, he fell on the property of a house on Lombard Place. Officer Lockmiller confirmed that the entire time Defendant was being pursued, he was on private property.

On redirect examination, AUSA Lewen asked Officer Lockmiller to identify the date on the back of the photographs shown to him on cross examination by defense counsel, specifically Exhibit 4f. Officer Lockmiller stated that the date on the pictures is April 15, 2008, but the incident and

arrest in question happened on December 31, 2007.  Officer Lockmiller also confirmed when he arrived at 1801 Lombard, Officers Crothers and Stevens were already there and talking to Mr. Davis. When he approached, Officer Lockmiller asked the other officers for details as to the events in question.  Officer Lockmiller further stated that Mr. Davis described what Defendant was wearing and pointed in the direction of the Defendant at the same time Defendant was coming down the stairs.  The only time that elapsed was the time that it took for him to turn around and make eye contact with the Defendant.  Mr. Davis, in addition to telling the officers the clothing that Defendant was wearing, also stated that the Defendant vandalized his house, but Mr. Davis made no mention of a gun.

On recross examination, Officer Lockmiller indicated that in regard to the April 15, 2008 date, it could be the date the picture was taken or the date it was developed, he does not specifically know what date it refers to.  However, he did state that the pictures fairly and accurately represent the area as he recalled it from December 31, 2007, taking into account discrepancies previously identified by his testimony.  Officer Lockmiller also confirmed that there is a camera in his cruiser which records information any time the cruiser is running.  The system is digital and as long as the cruiser is running, the camera is recording.[2]

### B.     Ronnie Davis

The only witness called by the defense was Ronnie Davis, who lives at 1801 Lombard Place. Mr. Davis has lived there for two years and is the owner of the property.  Mr. Davis testified he was

---

[2]At this point in the hearing, defense counsel tried to play the recording from Officer Lockmiller's cruiser, as well as a recording from Officer Stevens' cruiser, from December 31, 2007.  The audio equipment in the courtroom was not providing any sound; the Court has reviewed the information contained in the recordings and incorporates it into its findings of fact.

at his residence on the night of December 31, 2007 and remembers that there were about three or four people outside his residence who were kicking the front door, broke his front window, and cut the window screen on the side of the house.  Mr. Davis testified he was inside the house when the vandalism occurred.  Mr. Davis stayed inside the house and testified he did not see who vandalized the house.  He stated he called the police and when they came, he came outside to talk to them.  Mr. Davis stated he talked to two police officers in his front yard and when the officers asked him who was the person who committed the vandalism, he stated he told them he did not know.  He testified he did not know who the vandals were because he was scared to go outside while the vandalism was occurring.

Mr. Davis stated that he knows Mr. Jarnigan from Lombard; Mr. Jarnigan is kin to Mr. Davis's girlfriend.  Mr. Davis stated he thinks Mr. Jarnigan is his girlfriend's nephew.  Mr. Davis further testified he did not see Mr. Jarnigan on the evening of December 31, 2007.  He stated he did not point anybody out to the police when they were interviewing him about the vandalism incident.  He repeated he stayed inside his house during the incident, and only heard the vandals outside, but did not see anyone.

On cross-examination, AUSA Lewen asked Mr. Davis if he still lives at 1801 Lombard Place, to which Mr. Davis replied in the affirmative.  He further stated his girlfriend's name is Sherry Muse, but the woman who was with him on December 31, 2007 was Jamie Matthews.  He also stated that Jamie Matthews and her husband, Cory, were renting a room from him, thus both of them were at his house on December 31, 2007.  Mr. Davis was asked whether somebody had pulled a gun on Mr. Matthews' husband earlier in the day, but Mr. Davis testified he did not know.

Mr. Davis further stated that when the police arrived, he told them about the damage to his

window and door. He testified he did not call the police initially, but that the call was placed by Jamie Matthews. However, he admitted that while Ms. Matthews was on the phone with the 911 operator, he spoke in the background that he wanted the police to respond quickly to his complaint so that the damage to his house could be addressed. Mr. Davis stated he was scared to go outside since the vandals were terrorizing his house, he didn't want them to terrorize him. He also testified he did not remember Ms. Matthews telling the 911 operator that the vandals had a gun. Mr. Davis stated he wanted to file a police report so that he could get his window and door fixed. He also wanted the police to find the people who were responsible for vandalizing his house.

AUSA Lewen then asked Mr. Davis if, once Mr. Jarnigan was arrested, he told the police that they had the wrong person. Mr. Davis stated that he did not say that to the police, but that he remembered that Cory Matthews said something to that effect to the police. AUSA Lewen then asked Mr. Davis if he remembered hearing Ms. Matthews tell the 911 operator that the vandals had a gun, to which he replied no. However, AUSA Lewen stated that Mr. Davis is in the background when Ms. Matthews is making the call and asked if Mr. Davis would like the tape played to refresh his memory. Mr. Davis responded in the affirmative. While the tape was playing, Mr. Davis identified the caller as Jamie Matthews. He further stated that while the Defendant does not live at 1801 Lombard, he has family who lives there and that there were New Year's Eve parties that night. Mr. Davis further testified that he may have been in the kitchen while the call was being made and confirmed that he and Cory Matthews heard her make the call.

Mr. Davis was scared to go outside because the vandals were getting rowdy and the glass to the window was broken, perhaps by a brick or a rock. He saw a rock laying beside the window. He stated his windows have two panes and just the outside part of the window was broken. He also

stated that he is not sure how Ms. Matthews saw a gun since she did not look out the window either. Mr. Davis then testified that a woman named Nicki lives across the street from him.

Mr. Davis further testified that he wanted the person who broke his window to pay to replace it, which is why he called the police. He stated that when the police arrived, he was no longer scared to go outside. Mr. Davis did not know if the Defendant was across the street that night nor did he see him over there that evening. He also stated he did not identify the Defendant to the police nor did he tell the police that the vandalism suspect was wearing a white jacket and a red hoodie.

On redirect, Mr. Davis again stated that the police were called in response to the vandalism to his house and that he wanted them to apprehend the person who did it. When the police arrived and he went outside to talk to them, he did not know that Mr. Jarnigan was involved. He stated he did not know who vandalized his house nor did he know how many people were involved. He had all of his blinds shut as well as the door in his kitchen. He stated he did not even look out the peephole. Mr. Davis further testified that he did not point to the Defendant and identify him to the police as the person who vandalized his house.

### C.    *Officer John Stevens*

When the suppression hearing was re-opened on May 15, 2008, the government called Officer John Stevens ("Officer Stevens") with the KPD. Officer Stevens has worked for the KPD as a beat officer for about a year and a half. He testified he was working on the evening of December 31, 2007 and responded to a 911 vandalism call at 1801 Lombard Place. He testified that the 911 call advised him of the following information: that the suspect of the vandalism was a black male; there was a gun at the scene; and that the door to the residence was knocked down. Officer Stevens further stated he is familiar with the area surrounding Lombard Place and that the KPD

receives calls reporting gun activity and drug activity in the area. He also testified that since it was New Year's Eve, there were increased reports of gun shots and fireworks.

Officer Stevens stated he and Officer Crothers arrived at 1801 Lombard about fifteen minutes after receiving the 911 call information. When the officers arrived, they were approached by the 911 complainant, Ms. Matthews, and the owner of the home, Mr. Davis. Further, Officer Stevens stated he saw the broken window. Officer Stevens further testified that Ms. Matthews was the one who identified the Defendant as the vandal. Ms. Matthews leaned in towards Officer Stevens and said "that's him" and motioned in the direction of the Defendant, who was across the street. She further told Officer Stevens that the vandal was "the one in the jacket coming down the stairs." Ms. Matthews was standing next to Mr. Davis.

Officer Stevens then stated that at this point, Officer Lockmiller arrived at the scene. Officer Stevens stated he and Officer Crothers started walking towards the Defendant and that the Defendant started walking away, then started running. Officer Stevens said he and the other two officers took three different routes and started running after the Defendant. Officer Stevens ordered the Defendant to stop, but he did not. According to Officer Stevens, the Defendant was running erratically and then he fell down, which allowed the police to apprehend him and take Mr. Jarnigan into custody. Once Mr. Jarnigan was taken into custody, Officer Stevens noticed that the Defendant smelled of alcohol and was slurring his speech. Officer Stevens stated that the Defendant was the person identified by Ms. Matthews.

On cross examination, Attorney McGovern asked whether Officer Stevens was asked to be at the initial suppression hearing on April 16, 2008. Officer Stevens stated he was not asked to be there nor does he remember where he was that day. Attorney McGovern then showed Officer

Stevens a sketch drawn of Lombard Place, which was subsequently marked as Exhibit 10. Officer Stevens made the following designations on the diagram: "X" is where he parked his police cruiser, on Lombard; "A" is where Mr. Davis and Ms. Matthews were standing; and "B" is where the damage to the front window was. Officer Stevens then testified that Ms. Matthews whispered to him "that's him" and she nodded her head in the direction across the street; she did not overtly point out the Defendant. Officer Stevens did not know whether Officer Lockmiller could hear what Ms. Matthews said.

Officer Stevens was then showed Exhibit 7, which was a copy of the police report he entered detailing the vandalism complaint. The police report identifies the suspect as "Bulldog" and does not state that the victim identified a suspect. Officer Stevens stated he did not know why the information regarding the ID was not in the report, but admitted it should have been. He further stated that he did not remember if Ms. Matthews told him what the suspect was wearing.

On redirect, AUSA Lewen asked Officer Stevens if he turned in a supplemental report the next day. Officer Stevens answered in the affirmative and stated the supplemental report contains language that Ms. Matthews and Mr. Davis identified a "black male walking out of a nearby house and stated that he was the suspect in the vandalism" [Ex. 8].

### D.     *Officer Caleb Crothers*

The government's final witness was Officer Caleb Crothers ("Officer Crothers") with the KPD. Officer Crothers stated he has worked for the KPD for about a year and a half. As part of his responsibilities, he answers calls for service. He was working on the evening of December 31, 2007 and responded to a 911 call at 1801 Lombard Place reporting a vandalism. He stated he believed, from the details of the 911 call, that the suspect was a black male and may have been armed. He

further stated that calls for service in the Lombard Place/Green Hills area are high.

When he arrived at 1801 Lombard Place, Officer Crothers encountered Mr. Davis, the property owner, and Ms. Matthews, the woman who placed the 911 call who was renting a room from Mr. Davis. Officer Crothers began talking with both Mr. Davis and Ms. Matthews in order to gather information regarding the vandalism. Ms. Matthews identified the suspect by telling the officers he was the one wearing the white jacket going down the stairs. Mr. Davis, Ms. Matthews, and the two officers were all outside in the front yard; Mr. Davis and Ms. Matthews were facing across the street. The officers had their backs to the street, thus, they had to turn around when Ms. Matthews identified the suspect.

Officer Crothers then stated that he and Officer Stevens started to walk across the street and when the Defendant began to run, they gave chase. Officer Crothers stated he saw Defendant running erratically and that once he fell, Officer Stevens approached him first.

On cross-examination, Officer Crothers stated the pursuit began when Defendant started to run; he ran between the houses and back behind the yard. Once Defendant got to the bottom of the stairs, he began to run from the officers. Officer Crothers stated he went to the right to follow Defendant and Officer Stevens went to the left.

### III.    Finding of Facts

The Court finds that on December 31, 2007, Ms. Jamie Matthews made a 911 call reporting a vandalism at 1801 Lombard Place, Knoxville, Tennessee. The call reported that a black male with a gun was trying to break in their door and get in the house. The person trying to break in the door was identified by Ms. Matthews as the same person who jumped her husband earlier that day. Ms.

23

Matthews knew the person who was banging on the door because the person lived across the street from 1801 Lombard. Ms. Matthews and her husband were renting a room at 1801 Lombard at the time the 911 call was placed. Ronnie Davis, the owner of the residence at 1801 Lombard, was present when the 911 call was made and could be heard in the background of the call. He was anxious for the police to respond to the vandalism complaint. Officers Lockmiller, Stevens, and Crothers, all with the KPD, responded to this 911 call. Officers Stevens and Crothers arrived at 1801 Lombard first, followed by Officer Lockmiller. The Court finds 1801 Lombard Place was a high crime area on December 31, 2007 based on the officers' testimony.

Officers Stevens and Crothers arrived at 1801 Lombard, prior to Officer Lockmiller arriving. Officers Stevens and Crothers arrived about fifteen minutes after receiving the 911 call information. From this Court's review of the video recording from Officer Stevens's police cruiser, in conjunction with the testimony given at the hearing, the Court further finds the following facts. When Officers Stevens and Crothers arrived, they spoke with Ms. Matthews and Mr. Davis in the front yard of 1801 Lombard. The officers observed a broken window, which Mr. Davis confirmed resulted from the vandalism. Both Mr. Davis and Ms. Matthews told the officers they were not sure if the suspect had a gun when he came to 1801 Lombard, but that he had one earlier, about thirty minutes prior to his coming over to 1801 Lombard, when he pulled a gun on Ms. Matthews's husband, Cory Matthews. Ms. Matthews further stated that someone came to door, said their name was Bulldog, told them to open the door, subsequently kicked the door and broke a window. While talking to the police, Ms. Matthews identified Mr. Jarnigan, who was standing on the porch across the street, as the vandalism suspect. Ms. Matthews identified Mr. Jarnigan by leaning in and quietly telling the officers that the suspect was the person over there, coming down the stairs.

This Court, however, does not feel the evidence establishes that Mr. Davis identified the Defendant as the vandalism suspect to the police. Because of directly contradictory testimony from Officer Lockmiller and Mr. Davis, neither of whose testimony was impeached or corroborated regarding Mr. Davis's identification of Defendant or Mr. Davis's denials of the same, the Court is unable to find that the evidence preponderates either way. In any event, it is not necessary to establish that Mr. Davis identified the Defendant as the Court finds Ms. Matthews did.

Once Ms. Matthews identified the suspect as the person coming down the porch stairs from the house across the street, the Court finds when the police turned and made their way towards the house across the street, Defendant first began to walk away, then he started to run; his run was unprovoked and erratic. Once Defendant began to run, all three officers gave chase. Officers Stevens and Crothers followed the Defendant, while Officer Lockmiller ran north on Lombard. The foot chase occurred behind the houses on Lombard; Defendant did not run out into the street. Officers Stevens yelled for Defendant to stop; Defendant did not stop on his own volution. Instead, Defendant tripped and fell, which ended the chase. Once Defendant fell, the officers took him into custody, arresting him for vandalism, evading on foot, and public intoxication.

Once arrested, the officers conduced a pat down search for safety and a search incident to an arrest, which yielded several live rounds of Winchester 9-millimeter ammunition found in Defendant's pocket. A semiautomatic handgun loaded with Winchester 9-millimeter bullets was later found when the police canvassed the direct route of the foot pursuit. The gun was found underneath the wheel well of a Mercedes Benz, parked near a house on Lombard Street. When the officers brought Defendant back to their police cruiser, a group of people had congregated in the area, including a group near the house where Defendant initially fled from. Ms. Matthews and Mr.

Davis were standing next to the police cruiser. Upon seeing Defendant being apprehended, Ms. Matthews went inside of 1801 Lombard to call 911 a second time. On her subsequent call to 911, Ms. Matthews asked the operator to let the police know they, in fact, had the person in custody who earlier pulled a gun on her husband, Cory Matthews, but that she was afraid to tell that to the police in front of the crowd that had gathered outside 1801 Lombard. The person who pulled a gun on her husband earlier is also the way Ms. Matthews identified the person who broke the window and tried to kick down the door at 1801 Lombard during her initial call to 911.

## IV. Position of the Parties

Defendant Jarnigan moves the Court to suppress all evidence obtained subsequent to his detention by the KPD on December 31, 2007 [Doc. 15]. Defendant contends that his detention was without reasonable suspicion or probable cause, thus it was in violation of the Fourth Amendment. Defendant contends since there was no probable cause for his warrantless arrest, his initial "take-down" and detention must be analyzed under the rubric of Terry v. Ohio, 392 U.S. 1, 9 (1968), which requires (1) a proper basis for the stop, *i.e.*, whether law enforcement officials were aware of specific and articulable facts that gave rise to reasonable suspicion and (2) if the stop was proper, whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of officials' conduct given their suspicions and their surrounding circumstances. Defendant contends the initial stop was not supported by reasonable suspicion and that the degree of intrusion was unreasonable.

The government responds that Defendant's arrest on December 31, 2007, and any evidence obtained as a result of that arrest, was lawful since the arrest was supported by probable cause [Doc.

20].  The government submits the police had probable cause to pursue Defendant Jarnigan for the reported vandalism that occurred at 1801 Lombard Place.  The government further contends that once apprehended, the police had probable cause to arrest Defendant for vandalism, evading arrest, and public intoxication.

## V.    Burden of Proof

Although the proponent of a motion to suppress generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure, Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978), it is the government's burden to demonstrate by a preponderance of the evidence that a particular seizure was based either on probable cause or reasonable suspicion. United States v. Baldwin, 144 Fed. Appx. 675, 681 (6th Cir. 2004); United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990).

## VI.   Analysis

### A.    Credibility

Much of the determination of this motion turns on the credibility of the witnesses.  The primary factual dispute in this matter is whether the Defendant was identified by Ms. Matthews or Mr. Davis and whether the officers were told what Defendant was wearing the evening of December 31, 2007.  Officer Lockmiller testified Mr. Davis identified the Defendant as the person who broke his window and that Mr. Davis told the police the person who vandalized his house was wearing a white jacket and a red hoodie.  Mr. Davis, on the other hand, testified he never identified a suspect to the police since he did not see who vandalized his house.  Mr. Davis maintained throughout his

entire testimony that while the vandalism occurred, he did not look outside to see who was on his porch because he was scared, thus he was unable to identify a suspect to the police. Officers Stevens and Crothers both stated Ms. Matthews identified the Defendant as the suspect, by leaning in towards them and quietly identifying Defendant, who was across the street. Officer Stevens admitted he did not remember if Ms. Matthews stated anything about what Defendant was wearing; Officer Crothers testified that Ms. Matthews stated Defendant was wearing a white jacket.

The government urges the Court to disbelieve Mr. Davis's testimony on the basis that Mr. Davis is faced with a "Hobson's Choice" in testifying. The government contends that Mr. Davis still lives at 1801 Lombard, which is across the street from Defendant's family; thus, his incentive to recant his identification is great given the circumstance that he must interact with his neighbors on an daily basis. Defense counsel, on the other hand, urges the Court to disbelieve Officer Lockmiller's testimony since it is inconsistent with all of the other testimony, given that the record does not reflect that Mr. Davis identified the Defendant to the police as the person who vandalized his house.

In regard to Mr. Davis's and Officer Lockmiller's testimony, this Court finds it is unable to accept either testimony as preponderating over the other. Neither sufficiently impeached, but neither testimony, on this issue, was corroborated either. As to Mr. Davis's testimony, the Court finds his testimony was overall consistent, even in light of tough questioning, at a quick pace, from the government. The Court was able to observe his demeanor and finds Mr. Davis's responses do not reflect someone who changed his account of the facts for his own benefit. As to Officer Lockmiller's testimony, the Court finds it inconsistent with the testimony given by Officers Stevens and Crothers, which established that Ms. Matthews, not Mr. Davis, identified Defendant as the

vandalism suspect. Accordingly, the Court finds the testimony given by Officers Stevens and Crothers credible, was corroborated by each other's testimony as well as the other evidence in the record, and not impeached by other evidence in the record.

**B.    *Seizure of Defendant Jarnigan***

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures". U.S. Const. amend. IV. For a search or seizure to be reasonable, it generally must be effectuated pursuant to a warrant based upon probable cause. "Encounters between police officers and citizens can be grouped into three categories: 'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or <u>Terry</u> stop which must be predicated upon reasonable suspicion and arrests which must be based on probable cause.'" <u>United States v. Campbell</u>, 2007 WL 1501281 at *3 (6th Cir. 2007) (quoting <u>United States v. Bueno</u>, 21 F.3d 120, 123 (6th Cir. 1994)). In this case, neither party contends a consensual encounter occurred. Defendant Jarnigan contends his warrantless arrest was not supported by probable cause, thus his initial chase, which resulted in his detention, must be analyzed as a <u>Terry</u>-type stop. The government, on the other hand, contends Defendant Jarnigan's pursuit and arrest was supported by probable cause for vandalism, evading arrest, and public intoxication. Accordingly, this Court will analyze the officers' chase of Defendant Jarnigan and his subsequent detention and arrest under both frameworks.

**1.    <u>Terry Stop</u>**

Under <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968), an officer may conduct a brief investigatory stop where the officer has reasonable articulable suspicion that criminal activity may be afoot. In the

Sixth Circuit, " the constitutionality of a <u>Terry</u> stop" is evaluated by a "two-part analysis of the reasonableness of the stop." <u>United States v. Davis</u>, 430 F.3d 345, 354 (6th Cir. 2005). The Court is to "first ask 'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.'" <u>Id.</u> (quoting <u>United States v. Garza</u>, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the stop was proper, then the Court "must determine 'whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" <u>Id.</u> (quoting <u>Garza</u>, 10 F.3d at 1245). Defendant Jarnigan challenges the constitutionality of the instant <u>Terry</u> stop along both dimensions, contending the initial stop was not supported by reasonable suspicion and that the degree of intrusion was unreasonable.

### a.    Reasonable Suspicion

The first prong of the analysis relates to the articulation of reasonable suspicion. While reasonable suspicion is an "elusive concept", it nevertheless demands that the "detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981). This is because the "demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence." <u>Terry</u>, 392 U.S. at 22 n. 18. Nevertheless, courts are to allow "officers to draw on their own experience and specialized training to make inferences and deductions about the cumulative information available to them that might elude an untrained person." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002). Ultimately, in evaluating whether there was an objective basis for reasonable suspicion to stop an individual, a

court is to look "at the totality of the circumstances - the whole picture." <u>Cortez</u>, 449 U.S. at 417.

The totality of the circumstances suggests that the officers responding to the 911 call had a particularized and objective basis for concluding that Defendant was engaged in criminal activity. The Court first begins its inquiry with the fact they received a 911 call from Ms. Matthews reporting a vandalism. In the 911 call, Ms. Matthews told the 911 operator that the person trying to knock down the door and break into the house was the same person who pulled a gun on her husband earlier in the day. Ms. Matthews also identified the suspect as living across the street from 1801 Lombard. In this instance, the 911 caller identified herself and the location she was calling from, gave the 911 operator her phone number, and was a "known informant whose reputation [could] be assessed" once the police arrived on the scene and asked her questions in relation to the criminal complaint she made. <u>Florida v. J.L.</u>, 529 U.S. 266, 269 (2000). Furthermore, when the KPD responded to the 911 call, Officers Stevens and Crothers were able to personally speak with Ms. Matthews and she specifically identified Defendant as the suspect. She stated that the man across the street coming down the stairs was the person who pulled a gun on her husband and who vandalized 1801 Lombard.

The Court "next turns to [Jarnigan's] reaction upon" seeing three KPD officers at 1801 Lombard. <u>United States v. Caruthers</u>, 458 F.3d 459, 466 (6th Cir. 2006). "The Supreme Court has explained that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." <u>Id.</u> (quoting <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000)). In <u>Wardlow</u>, police officers in unmarked cars swooped into an area known for heavy narcotics trafficking. They observed Wardlow standing next to a building holding a plastic bag. Upon seeing the officers, Wardlow ran. He was apprehended and a handgun was discovered. The Supreme Court held that Wardlow's

unprovoked flight in a high-crime area gave rise to reasonable suspicion justifying a <u>Terry</u> stop and frisk. <u>Id.</u> ("Headlong flight-wherever it occurs-is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it certainly suggestive of such."). The Court also emphasized that "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." <u>Id.</u> However, because an individual has a right to decline a police encounter, <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (2006), <u>Wardlow's</u> discussion of headlong flight must not be read in a vacuum.

In the present case, Defendant Jarnigan does not dispute that he recognized the police, was "[f]rightened by the sight of the police officers moving in his direction, and ... impulsively ran around to the back of his sister's house" [Doc. 16 at 2]. Instead, he contends his "mere[] running on private property, without more, cannot give rise to a reasonable suspicion of any criminal activity." <u>Id.</u> at 3. However, as established above, Defendant's running from the police was not the only consideration in their giving chase; if the record reflected that contention, then this Court would agree with Defendant's position. <u>See</u> <u>United States v. Gholson</u>, 181 Fed. Appx. 299, 302 (3d. Cir. 2006) (without more, unprovoked flight under <u>Wardlow</u> is "not enough to justify a <u>Terry</u> stop."). But, the record reflects that the Officers Stevens and Crothers were responding to a 911 call which identified a "black male with a gun ... who lives across the street" as the suspect of a reported vandalism and the particular black male, the Defendant, was identified by Ms. Matthews. The officers observed Defendant coming out of a house across the street from 1801 Lombard. Furthermore, Defendant was identified by Ms. Matthews, the 911 complainant, upon sight that he was the person who pulled the gun on her husband earlier in the day and then vandalized 1801 Lombard by breaking a window and kicking in the door. Viewed together, this Court finds it was

reasonable for the police to believe that Defendant Jarnigan "fled ... so that he could discard a weapon or other contraband." Caruthers, 458 F.3d at 467, or as an act of evading the police, Wardlow, 528 U.S. at 124..

Finally, the Court considers the fact that the officers encountered Defendant in a high-crime area on New Year's Eve. Although the "high-crime" area factor may not, without more, give rise to reasonable suspicion, it is relevant to the reasonable suspicion calculus. Caruthers, 458 F.3d at 467

Based on the analysis above, this Court finds that the totality of the circumstances establishes that the officers had a particularized and objective basis for suspecting the Defendant based on: (1) a 911 call reporting vandalism and/or a potential break-in at a particular location; (2) the 911 complainant indicated a known person who earlier had a gun and had pulled it out on her husband; (3) an individual whose location matched the description given in the 911 call; (4) an eyewitness identification of the individual (Defendant) by the 911 complainant, Ms. Matthews, as being both the vandal and the one who pulled a gun on her husband earlier that night; (5) Defendant's unprovoked flight from the officers when the officers headed in his direction across the street; and (6) that the encounter occurred in a high-crime area, all of which, provided reasonable suspicion for the officers to conduct a Terry stop.

### b.     Degree of Intrusion

Next, the Court must determine whether the degree of intrusion (or detention) was reasonable, that is, (1) was it sufficiently limited in time and (2) were the investigative means used the least intrusive means reasonably available. Defendant challenges his detention on the grounds that it was in excessive in time since "several persons [at the location of the disturbance call]

33

notified the KPD officer that the Defendant was not the suspect."

A <u>Terry</u> stop allows officers to briefly detain and question a suspect based upon reasonable suspicion that the suspect had been or is presently involved in a crime.  <u>Hayes v. Florida</u>, 470 U.S. 811, 816 (1985).  The scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop.  <u>United States v. Sharpe</u>, 470 U.S. 675, 682 (1985).

When an individual is subject to a lawful investigative stop, an officer may conduct a limited frisk or pat down of that person for weapons if the officer has reasonable suspicion of criminal activity and a reasonable belief that the suspect he is investigating at close range may be armed and dangerous.  <u>Terry</u>, 392 U.S. at 26-27; <u>see also</u> <u>United States v. Walker</u>, 181 F.3d 774, 778 (6th Cir. 1999).  "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer under] the circumstances would be warranted in the belief that his safety and that of others was in danger."  <u>Terry</u>, 392 U.S. at 27; <u>see also</u> <u>United States v. Thomas</u>, No. 04-5872, 2005 WL 1869676, *2 (6th Cir. Aug. 3, 2005).  In other words, "[t]he purpose of the search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence."  <u>United States v. Vite-Espinoza</u>, 342 F.3d 462, 466 (6th Cir. 2003).  During such a stop, a police officer may also handcuff the suspect if the officer fears for his or her own safety, and the mere handcuffing does not transform the stop into an arrest.  <u>United States v. Atchley</u>, 474 F.3d 840, 848 (6th Cir. 2007).

In this case, once Defendant Jarnigan fell, he was taken into custody for vandalism and a pat down search was conducted.  The Court finds the pat down search was proper in light of the 911 call identifying the vandalism suspect as being armed and having pulled the gun on her husband.  The

police were justified in looking for any weapons on Defendant's person since he was identified, prior to his fleeing, by Ms. Matthews as the person involved in the vandalism and pulling a gun on her husband. While the search did not result in any weapons being found, the record reflects that several live rounds of Winchester 9-millimeter ammunition were found in Defendant's pocket. Furthermore, the police were justified in placing Defendant in handcuffs and escorting him to their cruiser for the same reason: Defendant was identified as being armed by Ms. Matthews during the 911 call and identified as the vandal. The Court finds the police could have reasonably believed that Defendant Jarnigan was potentially armed and dangerous and/or that he could access the missing weapon if not restrained. Thus, the pat down search and handcuffing of Defendant was proper, and the evidence found as a result thereof, the live rounds of Winchester 9-millimeter ammunition, is properly admissible against Defendant during trial.

### 2. Seizure Became an Arrest

In this case, the government concedes that after Defendant Jarnigan fell, he was placed under arrest by the officers. The government asserts, however, that the arrest was valid because it was based upon probable cause. Defendant contends his prolonged detention was improper since once he and the police returned to 1801 Lombard, the police were advised that the Defendant was not the vandal.

"When detention rises to the level of a full-fledged arrest ... the Fourth Amendment demands that the seizure be supported by probable cause." Gardenhire v. Schubert, 205 F.3d 303, 313 (6th Cir. 2000) (citing Dunaway v. New York, 442 U.S. 200, 212-14 (1979)). A "seizure" occurs for purposes of the Fourth Amendment when the police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave. See United States v.

Mendenhall, 446 U.S. 544, 554 (1980). The issue then becomes whether there was probable cause to make the arrest.

A warrantless arrest is constitutionally valid if, "at the moment the arrest was made, the officers had probable cause to make it - whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause is determined by the totality of the circumstances 'from a law enforcement officer's perspective.'" United States v. Craig, 198 Fed. Appx. 459, 462 (6th Cir. 2006) (quoting United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993)). A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. United States v. Amerson, No. 93-6360, 1994 WL 589626, at *2-3 (6th Cir. Oct. 21, 1994). An eyewitness identification will constitute sufficient probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" Id. at *2 (citation omitted). "This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity." United States v. Ingram, No. 92-5367, 1993 WL 5914 at *2 (6th Cir.) cert. denied, 510 U.S. 969 (1993).

Applying this reasoning to the instance case, the Court finds that Ms. Matthews two identifications of the Defendant as the vandal and the man who pulled a gun on her husband were sufficient to establish probable cause for Defendant's warrantless arrest. Ms. Matthews was the 911 caller who advised a black male with a gun has broken the window and kicked the door at 1801

Lombard. During her initial call to 911, she stated that one of the individuals outside the door was the same person who pulled a gun on her husband earlier that day. Additionally, when the police arrived at 1801 Lombard, she identified Defendant as the suspect to Officer Stevens, albeit, softly and quietly. There is nothing in the record which would indicate that the police should have suspected Ms. Matthews of falsification, inaccuracy, or mistake with respect to her identification, especially in light of the fact that once Defendant was brought back to the police cruisers parked in front of 1801 Lombard, Ms. Matthews called 911 again to ensure the police would be told they, in fact, had the right person in custody. Additionally, the officers had probable cause to arrest for public intoxication, TENN. CODE ANN. § 39-17-310, and evading arrest, TENN. CODE ANN. §39-16-603(a)(1)(A), once Defendant was apprehended.

### C. Admissibility of Evidence

As discussed above, the several live rounds of Winchester 9-millimeter ammunition was discovered during a pat down search of Defendant subsequent to a constitutional <u>Terry</u> stop, and thus, not subject to suppression. Defendant also challenges the admissibility of the black semiautomatic handgun loaded with Winchester 9-millimeter bullets which was found by the police along the path of his foot chase. The gun, which was found after Defendant Jarnigan was arrested, was not found on his person. It was found under the wheel well of a Mercedes Benz.

"No seizure occurs when there is a pursuit of a person attempting to evade police custody, and any evidence discarded or abandoned in the chase is not the fruit of a seizure." <u>California v. Hodari D.</u>, 499 U.S. 621, 627 (1991). Further, the warrantless search and seizure of abandoned property does not violate the Fourth Amendment. <u>Abel v. United States</u>, 362 U.S. 217, 241 (1960); <u>United States v. Caldwell</u>, No. 99-6031, 2000 WL 1888682 (6th Cir. Dec. 19, 2000). Additionally,

the Sixth Circuit has held that any evidence discarded by a defendant while evading the police is considered abandoned.  United States v. Williams, 949 F.2d 220, 222 (6th Cir. 1991).  In the instant case, since the gun was not found on Defendant, but instead found on the ground along the foot path, the Court finds the gun, if it was once possessed by Defendant, was abandoned, thus Defendant has no standing to challenge its seizure.  See Abel, 362 U.S. at 241 (holding that those who abandon property have no standing to challenge seizure); see also United States v. Dillard, 78 Fed.App'x. 505, 2003 WL 22400724 (6th Cir. Oct. 20, 2003) (quoting State v. Oliver, 368 So.2d 1331, 1336 (Fla.Dist.Ct.App. 1979)) (holding that an individual who, immediately prior to an encounter with the police, threw a paper bag to the ground on a public street lost any reasonable expectation of privacy in the property).  Whether Defendant was actually in possession of the gun prior to its abandonment is a matter that the government must prove at trial.  However, the Court finds, for purposes of this suppression motion, that if the gun was actually in Defendant's possession earlier, it was abandoned and as abandoned property, there is no basis for suppression of the gun.

**VII.    Conclusion**

For the reasons set forth herein, it is **RECOMMENDED** that Defendant Jarnigan's Motion to Suppress Evidence **[Doc. 15]** be **DENIED**.[3]

       s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3]Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  Thomas v. Arn, 474 U.S. 140 (1985).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).